UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | | |
|---|---|---|---|
| Stephen Montes Kerr | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** IN CHAMBERS — COURT ORDER

Before the Court is a Motion for Summary Judgment filed by defendant and counter-claimant Broadcom Corporation ("Defendant"). (Docket No. 61/85.)[1] Plaintiff and counter-defendant TomTom International, B.V. ("Plaintiff") has filed an Opposition, to which Defendant has filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for March 23, 2015 is vacated, and the matter taken off calendar.

## I.  Background

### A.  General Overview of GPS Technology

Plaintiff is a leading player in the portable navigation device ("PND") industry. PNDs combine digital maps with global positioning satellite ("GPS") data to provide users information about their precise geographic locations and directions to destinations. PNDs interact with the network of GPS satellites orbiting Earth by receiving signals that include both the location of the sending satellite and the time that the signal was sent. (See Expert Report of Dr. Duncan Cumming ("Cumming Rpt.") ¶¶ 13-15.) Using this information, a PND can determine its distance from the satellite sending the signal. (Id.) Because distance from a single satellite does not determine a precise location on Earth, a PND must receive signals from multiple satellites in order to triangulate its position. (Id.)

Locating available GPS satellites and processing the signals detailing their locations takes time. Because maintaining a constant satellite link would not be practical in light of limited power resources, PNDs must occasionally take the time to find GPS satellites in this manner. (Id. ¶ 15-16.) TomTom's solution to reduce the need to locate GPS satellites—and therefore reduce the "time to first fix"—is a feature called QuickFix. In essence, PNDs featuring QuickFix run in low-power mode (even when apparently turned off) to continue keeping time. Combining this information with predicted satellite locations at various times, PNDs featuring QuickFix have a head start when searching for GPS satellites.

---

[1] The docket includes redacted and non-redacted versions of the Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

(Id. ¶ 21.) Devices featuring QuickFix technology do not run in low-power mode indefinitely—instead, they include alarms that cause them to "suicide" after a specified period of inactivity. (Id.)

A PND's GPS chip is the component that performs the calculations used to triangulate a location. Plaintiff obtained GPS chips from a company called Global Locate until 2007. Plaintiff had worked with Global Locate to develop a chip called the Barracuda. (Id. ¶ 23.) The Barracuda supported QuickFix by keeping track of GPS time while in low-power mode. (Id. ¶ 22.) Defendant acquired Global Locate in 2007 and, in either 2007 or 2008, approached Plaintiff regarding their proposed design of a chip to replace the Barracuda (now given a Broadcom part number, 4750). (Id. ¶ 23.) The new chip was designated BCM4760 (the "4760"). (Id.)

### B. Development of the 4760 GPS Chip

The Barracuda/4750 GPS chip worked in conjunction with a "system on a chip" ("SoC") manufactured by Samsung. (Id. ¶ 22.) The 4760 was initially pitched as a complete "PND on a chip" that would perform the functions of both the Barracuda/4750 GPS chip and the Samsung SoC. (Id.) The 4760 would be accompanied by a power management unit chip (the "PMU").

The business relationship between Plaintiff and Defendant was not exclusive: Defendant developed the 4760 for sale to companies other than Plaintiff, and Plaintiff was still considering other chip suppliers for at least some of the period during which the 4760 was being developed. (See, e.g., Declaration of Andrew Dawson ("Dawson Decl."), Ex. 8 at 145:8-146:2.) Nonetheless, the parties discussed the 4760 in various meetings and correspondence. Plaintiff's accounts of the communications between it and Defendant emphasize alleged representations and warranties of the 4760's design and performance. (See, e.g., Opposition at 4-6.) Among other things, Plaintiff claims that Defendant represented that the GPS timekeeping function would be handled by the 4760, just as it was handled by the Barracuda/4750, and that the 4760 would perform as the Barracuda/4750 performed.[2] Defendant's accounts emphasize its alleged clarification that the low-power GPS timekeeping function required for QuickFix would be performed by the PMU rather than the 4760.[3]

---

[2] See, e.g., Declaration of Jedediah Wakefield ("Wakefield Decl."), Ex. 21 at 237 ("The BCM4760 baseband is composed of two primary blocks. The GPS Core block performs signal processing tasks. The Low Power (LP) block is used to maintain time-keeping . . . ."); Id. at 239 ("In Hibernate mode, power is applied only to the AON and I/O blocks, while in Standby mode, power is applied to the AON, I/O, core, GPS baseband, and GPS RF blocks."); Dawson Decl., Ex. 5 at 178a ("BCM4760 GPS performance is equivalent to Barracuda . . . .").

[3] See, e.g., Dawson Decl., Ex. 5 at 179 (2009 presentation noting "two options for resume from hibernate," namely the "PMU RTC method" and "4760's RTC method," and indicating that the PMU RTC method uses less power than 4760's RTC method); Id., Ex. 44 (January 2010 email correspondence in which Plaintiff's employee Rogier Stam ("Stam") acknowledged that the clock on the "4760 SOC . . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

Relying on the PMU to keep GPS time with the PND in low-power mode presented a challenge: Because the PMU tracked time in Julian format (year/month/day/hour/minute/second) and the 4760 tracked time in GPS format (seconds elapsed since midnight on January 6, 1980), timing information stored in one format in one chip would have to be converted to the other format to be used by the other chip. Defendant resolved the issue by writing software to perform this conversion. This file was named glgps_hal_syncin.c (hereafter the "conversion software"). The conversion software was included in an "official release" of GPS software are made available to Plaintiff via Defendant's customer-facing portal called DocSafe. (Declaration of Phonebandith Vilaysack ("Vilaysack Decl.") ¶ 3.) The conversion software was provided both as a source code file and as part of the compiled binary code. (Id. ¶ 6.) The conversion software was saved in a .zip file titled tomtom_Linux_BCM4760_le_arm11_external_fp_20090302_2.16.201.74142.zip, which included various GPS drivers. (Id. ¶¶ 5, 7.) This official release was downloaded by Plaintiff's engineers on April 2, 2010. (Id. ¶ 6.) Plaintiff points out that Defendant delivered software "through a variety of means including email, ftp, and through Broadcom's DocSafe customer support portal." (Opposition at 10.) While Plaintiff thus takes the position that it may have received the conversion software by means other than DocSafe, it does not appear to dispute that it also received and downloaded the conversion software through DocSafe.

      **C.**      **Software Licensing Agreement & Software Download Agreement**

Defendant points to two agreements that purportedly limit its liability for defective software. First, Defendant and Plaintiff executed a Software Licensing Agreement ("SLA") on November 20, 2008. (Dawson Decl., Ex. 3 at 120.) The SLA conspicuously warns that there is "no warranty and no support," "the software is offered 'as-is,' and Broadcom grants and licensee receives no warrant[i]es of any kind, express or implied . . . ." (Id. at 121, § 3.) However, the SLA applies only to software "which is described in a Software Description Form . . . ." (Id. at 120 § 1.10.) The Software Description Form ("SDF"), in turn, defines the "software being licensed" to include, among other things, the "ARM Only Linux Release" and, within that category, "GPS Drivers (combination of Source and Object code)." (Id. at 125.)

Second, prior to downloading any official software release through DocSafe, Plaintiff was required to agree to various disclaimers. This software download agreement ("SDA") provided, among other things, that "the software and any documentation and any (if any) support services related to the software or documentation are provided 'as is' and with all faults and Broadcom makes no promises, representations or warranties , either express, implied, statutory, or otherwise . . . ." (Dawson Decl., Ex.

---

does not survive suspend/resume, whereas the other one (59040) [the PMU] does"); Id., Ex. 49 (February 2010 email correspondence in which Stam noted that "bcm 4760 . . . uses the RTC (pmu in this case) to sync the time against (in order to get a quicker fix)"); Id., Ex. 53 (April 2010 email correspondence in which Defendant's employee explained to Stam that GPS time is read from "the PMU registers").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

25 at 440-41.) The SDA defines "software" to mean "the BROADCOM driver software made available for download or otherwise provided to Licensee by BROADCOM or its licensees." (Wakefield Decl., Ex. 16 at 164.)

### D. Manufacture & Purchase of PNDs Incorporating 4760 GPS Chip

Plaintiff did not purchase either finished PNDs or components directly from Defendant. Rather, Defendant sold chips to a Chinese manufacturer which, in turn, assembled and sold finished PNDs to Plaintiff. (See Dawson Decl., Ex. 8 at 70:4-21.)

### E. April 2012 Malfunction & Aftermath

Although it is not clear when PNDs incorporating the 4760 first reached consumers, it is undisputed that there were "millions" of PNDs incorporating the 4760 in consumers' hands as of April 1, 2012. (See Cumming Rpt. ¶ 43.)

2012 was a leap year. Although the conversion software correctly accounted for February's extra day that year for the month of March, it did not do so for subsequent months. (Id. ¶¶ 80-81.) Consequently, when PNDs incorporating the 4760 woke up from low-power mode and began their QuickFix search for satellites, they relied on day-old satellite locations and found nothing. Unable to receive any signals, these PNDs became useless. (Id. ¶ 79.) After this issue came to light on April 1, 2012, Defendant developed corrected software and delivered it to Plaintiff by April 2, 2012. (Vilaysack Decl. ¶ 11.) Plaintiff undertook a sweeping campaign to repair the affected PNDs by installing (and by having consumers install) the corrected software on PNDs equipped with the 4760. (Cumming Rpt. ¶ 84.) It is undisputed that no hardware changes were necessary to resolve the issue.

Defendant acknowledged its fault in running incomplete leap year testing for its conversion software. (See Id. ¶ 86.) Plaintiff provided a similar explanation to the public. For example, during Plaintiff's Q1 2012 earnings conference call on April 25, 2012, CEO Harold Goddijn noted that "[r]esults in the quarter were impacted by the costs of solving the effect of a malfunctioning software on a GPS chip, and as a result of this, some products could stop working properly after March 31. We quickly released a software update to fix the issue for our customers." (Dawson Decl., Ex. 62 at 670.)

Plaintiff filed its Complaint on March 28, 2014, and Defendant now moves for summary judgment.

### II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

"[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986); see also Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990). The moving party must affirmatively show the absence of such evidence in the record, either by deposition testimony, the inadequacy of documentary evidence, or by any other form of admissible evidence. See Celotex, 477 U.S. at 322. The moving party has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. See id. at 325.

As required on a motion for summary judgment, the facts are construed "in the light most favorable to the party opposing the motion." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). However, the nonmoving party's allegation that factual disputes persist between the parties will not automatically defeat an otherwise properly supported motion for summary judgment. See Fed. R. Civ. P. 56(c). A "mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" Fazio v. City & County of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at 249, 252). Otherwise, summary judgment shall be entered.

**III.     Analysis**

The threshold issue is whether the April 1, 2012 malfunction was due to a hardware defect or a software defect. If the malfunction was due to a hardware defect, Defendant argues that it is entitled to summary judgment because Plaintiff knew about the hardware design and because there was no privity between the parties. Moreover, even if you assume the malfunction was due to a software defect, Defendant argues that it is entitled to summary judgment because it disclaimed any warranties, express or implied. Regardless of the effect of its purported disclaimers, Defendant argues that Plaintiff's express warranty claim fails because none of Defendant's representations gave rise to warranties. Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's claim under Cal. Bus. Code §§ 17200, et seq., because Plaintiff's underlying claims fail and, in any event, because the statute does not apply to breach of warranty claims.

**A.     Hardware Defect vs. Software Defect**

Plaintiff contends that there is a genuine issue of fact as to the "root cause" of the April 1, 2012 malfunction. Defendant suggests that the malfunction was due to the conversion software, while Plaintiff argues that the analysis should begin one step back, with the design decision to assign the low-power GPS timekeeping role to the PMU rather than the 4760.

Defendant's position has the virtue of simplicity. There is a clear but-for relationship between the April 1, 2012 malfunction and the conversion software's leap year error. For example, PNDs were up and running as soon as the software update remedying this error was installed. Moreover it is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

undisputed that Plaintiff continued to produce and sell PNDs incorporating the 4760 (with corrected software) after April 1, 2012. Defendant's position is also compelling because it was, at least for a time, Plaintiff's position as well. Plaintiff's CEO, for instance, was willing to adopt the simple and straightforward software explanation when performing damage control in the immediate aftermath of the malfunction.

Plaintiff correctly argues that it is not bound by its public statements immediately following the malfunction, many of which were simply based on information that it received from Defendant. Still, its theory that "without the design departure from the 4750 [which performed the low-power timekeeping function], there would have been no need for the workaround code in the first instance and, had the GPS timekeeping element been left on . . . the devices would have needed no leap year correction" (Opposition at 12) is not persuasive. The fact that a particular hardware configuration called for software that turned out to be flawed does not mean that the hardware configuration was also flawed. It is true that "reliance on the workaround added an extra level of complexity" (Opposition at 8), but there is no dispute that this complexity could be, and eventually was, overcome. Plaintiff's position is tantamount to claiming that because driving in the rain presents greater opportunity for driver error, driving in the rain necessarily amounts to driver error.

### B. Software Warranties & Disclaimers

Because the April 1, 2012 malfunction was caused by a software coding error, Defendant seeks to shield itself with the disclaimers included in the SLA and SDA. Plaintiff argues that the disclaimers included in both agreements apply only to defined categories of software that do not include the conversion software. Moreover, Plaintiff argues that its engineers did not necessarily agree to the SDA when they received the conversion software. Defendant responds that, even if neither the SLA nor the SDA applies to the conversion software, Plaintiff used the software pursuant to an "implied license" that included no warranties.

#### 1. Applicability of Software Licensing Agreement

The parties do not dispute the existence or validity of the SLA, but rather whether the conversion software was among the software licensed under the SLA. Defendant argues that the SLA applies to <u>all</u> of the software that it provided to Plaintiff and that, even if the SLA applies only to those items listed in the SDF, the conversion software was a "GPS Driver" included as part of the ARM Only Linux Release listed in the SDF. Plaintiff argues that there is at least a genuine issue as to whether the SLA applies only to software listed in the SDF and whether the conversion software fits within any of the categories listed in the SDF.

##### a. There is a genuine issue as to whether the Software Licensing Agreement applies to all software that Defendant released to Plaintiff

The SLA expressly defines "software" to mean "that software which may be provided by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

Broadcom to Licensee from time to time and which is described in a Software Description Form executed by the parties . . . ." (Dawson Decl., Ex. 3 at § 1.10.) The SLA also includes a merger clause.[4]

Defendant's argument that the SLA applies to all software that Defendant provided to Plaintiff is based on evidence that it refused to release software to Plaintiff until the SLA was executed. Most of this evidence merely conditions particular releases on execution of the SLA,[5] but there is some evidence that Defendant intended the SLA to apply to all software releases. For instance, in a November 2008 email to Plaintiff's employee Vincent Wolfe ("Wolfe"), Defendant's employee Walter Rivera ("Rivera") noted that "[w]e require that TomTom sign a Software License Agreement so that we can release software builds to you whenever necessary. . . . With the SLA in place, you will be able to access software releases from the Broadcom CSP (Customer Support Portal) any time there is a release." (Dawson Decl., Ex. 21.) However, this evidence is insufficient to determine, as a matter of law, that the SLA applied to all of Defendant's software releases – particularly in light of the SLA's merger clause.

> **b. There is a genuine issue as to whether the conversion software was included as part of the ARM Only Linux Release listed in the Software Description Form**

The SDF includes, within the "Description of Software Being Licensed," the "ARM Only Linux Release." (Dawson Decl., Ex. 3 at 125.) The term "ARM Only Linux Release" is followed by a colon and a bullet list of items including "GPS Drivers (combination of Source and Object code)." (Id.) Thus, the SLA applies to particular software within the ARM Only Linux Release, which includes GPS drivers.

Defendant argues that the conversion software was a GPS driver included in the ARM Only Linux Release. First, Defendant argues that the conversion software was part of the ARM Only Linux Release by pointing to the fact that the conversion software was released in a .zip file titled

---

[4] "Entire Agreement. This Agreement, along with any associated Software Description Forms, sets forth the entire Agreement between the parties and supersedes any and all prior proposals, agreements and representations between them, whether written or oral. This Agreement may be changed only by mutual agreement of the parties in writing. In the event of a conflict between the terms of this Agreement and the terms of the Software Description Form, the term [sic] of the Software Description Form will prevail." (Id. at § 7.8.)

[5] See, e.g., Dawson Decl., Ex. 22 ("Since the initial release is the Alpha Release, we are planning to make that available to you next week assuming the SLA is in place."); Ex. 1 at 159:10-22 (deposition testimony regarding the fact that Defendant "wasn't going to release certain code to TomTom until TomTom has signed a Software License Agreement"); Ex. 9 at 246:22-248:6 (deposition testimony regarding the fact that Defendant would not release a board support package until the SLA was in place).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

"tomtom_**Linux**_BCM4760_le_**arm**11 . . ." (emphasis added), "which on its face is an "ARM . . . Linux Release." (Reply at 4.) Plaintiff disputes this characterization, suggesting that "'ARM Only Linux Release' refers to the Linux kernel, which is the main part of the operating system running the 4760 chips." (Opposition at 14.) Plaintiff points out, however, that the "Linux kernel" is one of the items included in the bullet list below "ARM Only Linux Release" in the SDF. (Dawson Decl., Ex. 3 at 125.)

Assuming, then, that "ARM Only Linux Release" does not refer solely to the Linux kernel, Defendant argues that the conversion software is a GPS driver because all software for GPS functionality, including the conversion software, was included in a single zip package. The zip package contained both source and object code, including a single, fully-compiled binary file that incorporated the conversion software. Although the source code was provided so that Plaintiff could modify certain software, Plaintiff did not work with the source code – instead, it only used the fully-compiled package. (See Wakefield Decl., Ex. 11 at 102:7-103:20.) The fully-compiled binary package – a lengthy table of ones and zeroes – would not have been readable by Plaintiff's engineers. (Indeed, this was why certain code was only included in the fully-compiled package – Defendant sought to limit customers' ability to read certain code.) (See Dawson Decl., Ex. 18 at 84:5-24.) Thus, Defendant argues, Plaintiff's position that the conversion software does not fall within the category of GPS drivers would require a fact-finder to take the view that the conversion software was the only non-driver file included in the package and that, as to the fully-compiled binary file that was actually used by Plaintiff, there were a handful of lines of code which, though they could not be identified by Plaintiff, were subject to warranty.

Plaintiff argues that the term "driver" is typically understood to refer to "a computer program that operates or controls a particular type of device that is attached to a computer." (Opposition at 14.) "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." Cal. Civ. Code § 1645.[6/] The conversion software cannot possibly satisfy this definition, according to Plaintiff, because its conversion function does not "control" a device and because it does not directly access hardware. (Opposition at 14.) Plaintiff has raised a genuine issue as to whether the conversion software was a "driver" for purposes of the SDF and SLA.

### 2. Applicability of Software Download Agreement

Regardless of the SLA's application to the conversion software, Defendant argues that because Plaintiff downloaded the conversion software through DocSafe, its engineers clicked that they agreed to the SDA and disclaimers contained therein. Plaintiff argues that there is an issue as to whether it

---

[6/] The SLA provides that "[t]his Agreement shall be governed by the laws of California without regard to any conflict-of-laws rules . . . ." (Dawson Decl., Ex. 3 § 7.3.) Accord Restatement (Second) of Contracts § 202(3)(b) ("Unless a different intention is manifested, . . . technical terms and words of art are given their technical meaning when used in a transaction within their technical field.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

actually obtained the conversion software through DocSafe or by some other means, such as email. Even assuming that Plaintiff obtained the software through DocSafe, however, there is a question as to whether the SDA applies. The SDA applies only to "driver software." (Wakefield Decl., Ex. 16 at 164.) For the reasons discussed above, there is a genuine issue as to whether the conversion software qualifies as driver software for purposes of the SDA.

### 3. Terms of Implied License

Defendant argues that if Plaintiff's use of the conversion software was not pursuant to the SLA or SDA, it must have been pursuant to an implied license. Defendant further argues that "even if [Plaintiff] were correct that it only has an implied license, that license also would include the same warranty disclaimers as the SLA." (Motion at 16.)

As a preliminary matter, the parties dispute whether any implied warranties arise by operation of law when a product is used pursuant to an implied license. Defendant appears to argue that all terms of an implied license are determined by the "licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct." See Asset Mktg. Systems, Inc. v. Gagnon, 542 F.3d 748, 756 (9th Cir. 2008). Plaintiff points out that the implied warranty of merchantability arises by operation of law, Hauter v. Zogarts, 14 Cal. 3d 104, 117 (Cal. 1975), suggesting that the question is not whether Defendant manifested intent to warrant the conversion software, but rather whether Defendant manifested an intent to disclaim warranties. Defendant does not cite, and the Court is unable to find, any authority suggesting that implied warranties do not arise as a matter of law with respect to products used pursuant to an implied license. Asset Mktg. does not discuss the non-applicability of implied warranties in this context. There does not seem to be any principle that would justify such a rule.

Turning to whether Defendant manifested its intent to disclaim any warranties with respect to the conversion software, Defendant argues that "objective indicia of [its] intent show that it would disclaim all warranties to its software in all events." (Motion at 16.) These include the SLA, the SDA, "the standard terms and conditions that [Defendant] referenced in its price quotes to [Plaintiff] and the draft Master Purchase Agreement that [Defendant] sent [Plaintiff] at the beginning of their relationship . . . ." (Id. at 16-17.)[7/] However, the SLA and SDA cut both ways. These documents may be reasonably interpreted to expressly disclaim warranties as to all software other than the conversion software, perhaps signaling Defendant's intent not to disclaim warranties as to that code. The terms of price quotes and the Master Purchase Agreement – to which Plaintiff did not agree – are insufficient to

---

[7/] Defendant also points out that the source code file containing the conversion software included a header indicating that use of the code required an "express written agreement with Global Locate," Defendant's predecessor. There is a genuine issue, though, as to whether this obsolete language manifested Defendant's intent.

Case 8:14-cv-00475-PA-DFM   Document 104   Filed 04/09/15   Page 10 of 12   Page ID #:2394

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

foreclose a genuine issue as to whether Defendant as part of its implied license impliedly disclaimed all warranties.

### C.     Express Warranties

"[T]o prevail on a breach of express warranty claim, the plaintiff must prove (1) the seller's statements constitute an 'affirmation of fact or promise' or a 'description of the goods'; (2) the statement was 'part of the basis of the bargain'; and (3) the warranty was breached." Weinstat v. Dentsply Int'l, Inc., 180 Cal. App. 4th 1213, 1227 (Cal. App. 2010) (quoting Keith v. Buchanan, 173 Cal. App. 3d 13, 20 (Cal. App. 1985)).  Defendant argues that Plaintiff cannot satisfy any of these elements.

First, Defendant argues that none of its statements can be construed as an affirmation of fact or promise or a description of the goods.  To the extent that it made any representations regarding the 4760, Defendant argues that these amounted to non-actionable puffery.  "[A] representation of fact, as opposed to mere puffery, is one which makes a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" Rasmussen v. Apple, Inc., 27 F. Supp. 3d 1027, 1039 (N.D. Cal. 2014) (quoting Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999)).  Plaintiff notes that, among other things,[8/] Defendant represented that "BCM4760 GPS performance is equivalent to Barracuda (BCM750) [sic]."  (Dawson Decl., Ex. 5 at 178a.)  This is a sufficiently specific and falsifiable claim.

Second, Defendant argues that none of its statements were part of the basis of the bargain because Plaintiff knew about the decision to assign GPS timekeeping to the PMU before the 4760 was purchased.  This argument does not address software performance.

Third, Defendant argues that there is no evidence of breach because all purported warranties were accurate on their face.  With respect to the representation highlighted above, however, there is at least a genuine issue as to whether the Barracuda/4750 and the 4760 exhibited equivalent GPS performance on April 1, 2012.  Accordingly, there is a genuine issue as to whether Defendant made and breached express warranties.[9/]

---

[8/]     Defendant objects to many of the purported representations that Plaintiff cites.  Because these representations need not be considered in order to dispose of the instant Motion, the Court does not rule on the objections at this time.

[9/]     Defendant directs its argument that Plaintiff's claim for breach of implied warranty is barred for lack of privity to Plaintiff's hardware theory, not the software theory.  See Motion at 19.  In any event, there is a genuine issue as to whether California's "direct dealing" exception to the privity requirement would apply in this case.  Cardinal Health 301, Inc. v. Tyco Electronics Corp., 169 Cal. App. 4th 116, 139-40 (Cal. App. 2008).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

### E. Section 17200

Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's claim under California's Unfair Competition Law (the "UCL"). The UCL applies to "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. First, Defendant argues that the UCL claim must fail because Plaintiff's underlying claims for breach of warranty fail. For the reasons discussed above, this argument is without merit. Second, Defendant argues that, in any event, breach of warranty does not qualify as an "unlawful, unfair or fraudulent business act or practice" for purposes of the UCL. See, e.g., Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1044 (9th Cir. 2010) (holding that "a common law violation such as breach of contract is insufficient" to satisfy the "unlawful" prong); Wang & Wang, LLP v. Banco do Brasil, S.A., No. Civ. S-06-00761 DFL KJM, 2007 WL 915232, at *4 (E.D. Cal. 2007) ("[A]ll that remains is a naked claim for breach of contract, which, standing alone, is an insufficient basis for a § 17200 claim.").

Plaintiff counters that its UCL claim does not live and die on the strength of its breach of warranty claims alone. Here, in addition to the "unlawful" breaches, Plaintiff argues that Defendant fraudulently concealed "its decision to disable GPS timekeeping within the 4760." (Opposition at 24-25.) Although "a UCL fraud claim 'can be shown even without allegations of actual deception, reasonable reliance and damage'; what is required to be shown is 'that members of the public are likely to be deceived.'" Collins v. eMachines, 202 Cal. App. 4th 249, 258 (Cal. App. 2011). "But members of the public under the fraudulent prong of section 17200 refers to consumers, not other business entities with a relationship with the alleged defrauder." Cabo Brands, Inc. v. MAS Beverages, Inc., No. 8:11-cv-1911-ODW(ANx), 2012 WL 2054923, at *5 (C.D. Cal. June 5, 2012) (citing Aron v. U-Haul Co. of Cal., 143 Cal. App. 4th 796, 806 (Cal. App. 2006); see also Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001) ("Though many courts have described the scope of business activities prohibited by § 17200 in sweeping terms, there is no case authority that 'fraudulent' business acts are separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived.").[10/] Here, there is no evidence that Defendant "concealed" its decision to move the timekeeping function to the PMU from anyone other than (perhaps) Plaintiff.

Plaintiff's UCL claim thus rests entirely on its breach of warranty claims. Defendant is entitled to summary judgment on the UCL claim.

---

[10/] Although the court in Allied Grape Growers v. Bronco Wine Co., 203 Cal. App. 3d 432 (Cal. App. 1988), noted that the parties had not cited any authorities holding "that a business practice had to affect more than one victim" to violate the UCL, this analysis focused on the meaning of "business practice" rather than "fraudulent." 203 Cal. App. 3d at 453.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 14-475 PA (DFMx) | Date | April 9, 2015 |
|---|---|---|---|
| Title | TomTom Int'l, B.V. v. Broadcom Corp. | | |

### Conclusion

For all of the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. The Motion for Summary Judgment on Plaintiff's claims for breach of express and implied warranty is denied. The Motion for Summary Judgment on Plaintiff's claim for violation of Cal. Bus. & Prof. Code §§ 17200, et seq. is granted.

IT IS SO ORDERED.